# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**WANDA MICHELLE WILEY,**

           **Plaintiff,**

**v.**                                        **Case No. 6:14-CV-1276-ORL-37KRS**

**COMMISSIONER OF SOCIAL SECURITY,**

           **Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

This cause came on for consideration without oral argument on the Complaint filed by Plaintiff Wanda Michelle Wiley seeking review of the final decision of the Commissioner of Social Security denying her claim for social security benefits, Doc. No. 1, the answer and certified copy of the record before the Social Security Administration ("SSA"), Doc. Nos. 12, 14, and the parties' Joint Memorandum.[1]   Doc. No. 16.

## PROCEDURAL HISTORY.

In 2010, Wiley filed an application for benefits under the Federal Old Age, Survivors and Disability Insurance Programs ("OASDI"), 42 U.S.C. § 401, *et seq.* She alleged that she became disabled on August 19, 2010.   R. 138.

---

[1] I required counsel for the parties to submit a single, Joint Memorandum with an agreed statement of the pertinent facts in the record.   Doc. No. 15.   Counsel for Plaintiff was ordered to identify and frame, in a neutral fashion, each of the disputed issues raised as grounds for reversal and/or remand, and counsel for the Commissioner was required to respond to each of those issues in the format set forth in the Revised Scheduling Order.   *Id.* at 4.

After her application was denied initially and on reconsideration, Wiley asked for a hearing before an Administrative Law Judge ("ALJ").  R. 87.  An ALJ held a hearing on October 12, 2012.  Wiley, accompanied by a representative, and a vocational expert ("VE") testified at the hearing.  R. 28-69.

After considering the hearing testimony and the evidence in the record, the ALJ found that Wiley was insured under OASDI through December 31, 2015.  The ALJ concluded that Wiley had not engaged in substantial gainful activity since the alleged disability onset date.  R. 13.

The ALJ found that from Wiley had the following severe impairments:  fibromyalgia, neuropathy, chronic fatigue, generalized arthritis, left shoulder degenerative joint disease, mild cervical degenerative disc disease, possible carpal tunnel syndrome, obesity, hypertension, headaches, asthma, and gastro-esophageal reflux disease.  R. 13.  The ALJ concluded that Wiley did not have any severe mental impairments.  R. 14.  Wiley's impairments, individually and in combination, did not meet or equal a listed impairment.  R. 15.

The ALJ found that Wiley had the residual functional capacity to do sedentary work, as follows:

> The claimant can perform sedentary work activity, with lifting/carrying of 10 pounds occasionally, standing/walking a total of 2 out of 8 hours, sitting a total of 6 out of 8 hours, perform postural activities occasionally, with no climbing ladders, ropes, or scaffolds, and rare stooping, kneeling, and crouching, and crawling, can frequently, but not continuously or repetitively use the upper extremities for reaching, handling, or fingering bilaterally, and a need to avoid concentrated exposure to temperature extremes, wetness, humidity, pulmonary irritants, and work hazards.

R. 15-16.  In making this finding, the ALJ gave no significant weight to a functional capacity assessment prepared by Jan Parrillo, M.D., a treating physician.  The ALJ gave only partial weight to the functional capacity assessment of Alex Perdomo, M.D., an examining physician.

R. 19.

After considering the testimony of the VE, the ALJ determined that Wiley could return to her past relevant work as a reservation clerk and claims clerk. Therefore, the ALJ concluded that Wiley was not disabled. R. 21.

Wiley sought review of the ALJ's decision by the Appeals Council. R. 7. On June 9, 2014, the Appeals Council found no reason to review the ALJ's decision. R. 1-3.

Wiley now seeks review of the final decision of the Commissioner by this Court.

## JURISDICTION AND STANDARD OF REVIEW.

Wiley having exhausted her administrative remedies, the Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g). A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

## SUMMARY OF THE FACTS.

After a thorough review of the record, I find that the facts are adequately stated in the parties' Joint Memorandum and the ALJ's decision, which statement of facts I incorporate by reference. Accordingly, I will only summarize facts pertinent to the issues raised to protect Wiley's privacy to the extent possible.[2]

---

[2] In the Joint Memorandum, counsel for Wiley does not challenge the ALJ's conclusion that Wiley did not have a severe mental impairment. Therefore, I will not summarize the records regarding mental health.

3

Wiley was born in 1967. R. 34. She attended school through college but did not have a college degree. *Id.* She was receiving long-term disability payments. R. 35. She did not have health insurance as of March 2012. R. 36, 56. During the hearing, the VE testified that Wiley's past relevant work included reservation clerk, which was a sedentary, skilled job. R. 56. She also worked as a claims clerk, which was a sedentary, semi-skilled to skilled job. R. 56-57.[3] These jobs would provide a sit/stand option. R. 61.

Wiley testified that she had multiple illnesses starting in 2007. She stopped working at a call center in 2010 because it hurt too much to sit for the whole day. R. 37-38. She complained of pain in her back radiating down her leg, pains in her shoulders, arms, hands and legs. R. 38. She had lower back spasms and radiated down her leg four or five times a week. R. 44. The only relief she could get was when lying down. R. 38. She also had migraine headaches. R. 53. She took medication for pain but it made her sleepy. R. 45. She spent most of the day lying on the sofa because she was fatigued and weak. R. 47.

She estimated that she could sit about ten minutes before needing to change positions. R. 40. She estimated that she could stand five to ten minutes. R. 41. She could walk ten to fifteen minutes but then might have to use an inhaler because she had shortness of breath. R. 42. Her feet hurt and tingled first thing in the morning, which made it painful for her to walk. R. 46. She sometimes used a cane or a walker. R. 57-58. She could not stoop. R. 42-43. She had weakness in her hands after shoulder impingement surgery and carpal tunnel surgery. R. 43. She cried all the time. R. 45. She did not want to be around people. R. 50.

---

[3] The VE testified that the reservation clerk job had an SVP of 5 and that the claims clerk job had an SVP of 4. A Social Security Ruling provides that an SVP of 3-4 is semi-skilled work and an SVP of 5-9 is skilled work. SSR 00-4p, 2000 WL 1898704, at * 3 (Dec. 4, 2000).

4

She could make simple food in a microwave.  She could put clothes in the washing machine and start it but her son took the wet clothes out and put them in the dryer.  She did not perform other household chores.  R. 48. She did limited driving because her right leg became weak.  R. 49. She did not sleep well due to restless leg syndrome.  R. 50. She sometimes needed help getting dressed.  R. 51.

The medical records confirm that Wiley complained of neck and shoulder pain and numbness in her left arm as early as 2003.  R. 472-73.  She was treated by Ahmed H. Sadek, M.D., a neurologist, beginning in October 2007 for complaints of severe low back pain radiating down her right leg.  R. 271-73.  Radiologic studies were essentially normal except for mild circumferential bulging at L4-5 and L5-S1, which did not explain Wiley's symptoms, and cervical lordosis with a C5-6 posterior disc bulge. R. 265, 273, 275, 286, 472, 486-87, 587, 604-08, 679-84.  Dr. Sadek treated Wiley with various medications but Wiley's condition did not improve. R. 275.

In October 2008, Brian K. Barnard, M.D., diagnosed cervicalgia, signs of left shoulder impingement, moderate left carpal tunnel syndrome confirmed by nerve testing and fibromyalgia. R. 290. Dr. Barnard did not state the basis of the fibromyalgia diagnosis.  In November 2008, Dr. Sadek also found that Wiley was presenting with a chronic pain condition probably consistent with fibromyalgia. R. 264.  In December 2008, a course of physical therapy was recommended to address Wiley's multiple musculoskeletal ailments.  R. 282. In January 2009, Dr. Sadek recommended that Wiley continue physical therapy and use of muscle relaxants and Lyrica.  R. 262.

An MRI of the shoulder taken in March 2009 showed mild bursitis, moderate tendinitis and mild AC arthritis, among other things. Richard M. Konsens, M.D., recommended that Wiley use ice, stretch and do home exercises. R. 278.

On August 17, 2010, Magdalena Beltre, M.D., recommended that Wiley lose weight and referred her for bariatric surgery. R. 318. Gastric bypass surgery was performed in December 2010. R. 572-73.

Wiley reestablished treatment with Dr. Parrillo, a primary care physician, in September 2010. R. 590, 670.[4] Upon examination, Dr. Parrillo observed "significant point tenderness and trigger point tenderness throughout her back." R. 590. Other than this observation, Dr. Parrillo's treatment notes do not contain many findings on examination. Dr. Parrillo added Cymbalta to Wiley's medication regimen, which also included Lyrica, Hydrocodone, Flexeril and medication for asthma and insomnia. *Id.* Wiley later told Dr. Parrillo that Cymbalta made her fatigued and "a little bit out of it." R. 589. Dr. Parrillo prescribed Lexapro for depression. *Id.* However, Wiley stated in October 2010 that Lexapro made her feel like she was in a coma. R. 587. Dr. Parrillo prescribed Savella for fibromyalgia, but it was also discontinued because Wiley could not tolerate it. R. 586-87.

Wiley began treatment with Jeffrey B. Poiley, M.D., a rheumatologist, in December 2010. R. 656. Dr. Poiley's treatment notes are largely illegible. R. 649-50, 656. Dr. Parrilo wrote that Dr. Poiley apparently believed that Wiley had inflammatory arthritis, but it is unclear whether that information was provided by Dr. Poiley or by Wiley. R. 663. It appears that Dr. Poiley prescribed Plaquinel and Robaxin. R. 650, 656.

---

[4] Records indicate that Dr. Parrillo first treated Wiley in October 2008. R. 723.

On March 24, 2011, Dr. Perdomo examined Wiley at the request of the Office of Disability Determination. R. 611-13. He did not have any of Wiley's medical records for review. R. 613. Dr. Perdomo observed Wiley walking down the hallway without any difficulties and without an assistive device. He noted that she appeared to be in pain while sitting and that she changed positions often. She complained of lower back, hip and knee pain from moving from the chair to the examining table. R. 611-12. Upon examination, Dr. Perdomo noted a positive Tinel's sign bilaterally. He found some limitation in range of motion in the shoulder and hips. Wiley had full range of motion in the hands and knees but some maneuvers were painful. Wiley could not squat. Range of motion was also limited in the spine with diffuse tenderness in the upper thoracic and lumbar paraspinal muscles. Straight-leg raising tests were negative for pain. Dr. Perdomo's impressions included "[p]olyarthralgia with moderate musculoskeletal functional limitations on physical examination of the shoulders, and hips, as well as painful bilateral hand and knee movements." R. 612. He also noted possible bilateral carpal tunnel syndrome. *Id.* He noted that X-rays of the shoulder, lumbosacral spine, hips and knees and an EMG study would be helpful for further evaluation. Also, he observed that Wiley would benefit from weight loss, more aggressive physical therapy and a home exercise program for back and general conditioning. R. 613.

Dr. Perdomo rendered the following opinion regarding Wiley's functional capacity:

> She can stand, walk, and sit for a combined total of 3 to 4 hours in an eight-hour workday with normal breaks. She can occasionally lift and carry, but should limit the weight lift[ed] to no more than 5 to 10 pounds. She should also avoid bending, stooping, crouching, squatting, or kneeling. This is due to the chronic back pain, diffuse joint pain, and the musculoskeletal functional limitations found on physical examination of her hips, lumbosacral spine, and shoulders, as well as painful bilateral hand and knee movements. She did not require an assistive device for ambulation. Due to the painful

7

>   bilateral hand movements she should avoid repetitive use of the hands including gripping maneuvers. . . . Because of her asthma she should avoid working in dusty environments, as well as exposure to extreme temperature or humidity changes.

R. 613.

On August 5, 2011, Walter Harris, M.D., affirmed a functional capacity assessment prepared by a single decisionmaker after review of Wiley's records. R. 693. Latrice Pitts, the single decisionmaker, opined that Wiley could lift twenty pounds occasionally and ten pounds frequently. She could stand and/or walk or sit about six hours in an eight-hour workday. She could only occasionally engage in postural activities. She could be limited in her ability to reach and engage in gross and fine manipulation. She should avoid concentrated exposure to extreme temperatures, wetness and humidity, environmental irritants and hazards. R. 72-79.

Meanwhile, Wiley continued to be treated by Dr. Parrillo. *See, e.g.,* R. 662, 697, 700, 706, 711. On February 9, 2012, Dr. Parrillo noted that Wiley had not increased her dosage of Cymbalta as prescribed. R. 697.

On September 28, 2011, Dr. Parrillo prepared a functional capacity check-the-box form. R. 694-96. Dr. Parrillo opined that Wiley could sit one hour and stand and/or walk one hour total in an eight-hour workday. She would need to alternative positions frequently, but she did not need an assistive device to stand or walk. R. 694. She could occasionally lift up to ten pounds. She could not push and pull with arm controls or perform fine manipulation. She experienced loss of grip strength and numbness. R. 695. She would need complete freedom to rest throughout the day, including lying down or sitting in a recliner for a substantial period of time during the day. These limitations were permanent. R. 696. Dr. Parrillo did not cite in the form to any objective findings supporting these limitations.

8

On January 17, 2012, Dr. Parrillo prepared an Attending Physician's Statement of Continued Disability for Wiley's disability insurer. R. 701-02. Wiley's primary diagnosis was fibromyalgia with secondary diagnoses of depression with anxiety, chronic pain and fatigue. R. 701. Dr. Parrillo indicated N/A in the Functional Capabilities section of the form. R. 702.

On June 4, 2012, Dr. Parrillo completed a form for Wiley's student loan provider. Dr. Parrillo wrote that Wiley had fibromyalgia, depression, chronic pain, fatigue, anxiety, and reduced range of motion in her left shoulder. Dr. Parrillo opined that that Wiley's limitations were "no standing, climbing, stooping, bending > 1 hour." R. 721. Dr. Parrillo wrote that Wiley's residual functionality was "outside my training." *Id.*

On June 5, 2012, Kim M. Foley, an RN employed by Wiley's disability insurer, wrote to Dr. Parrillo asking for information. R. 718-19. There are handwritten responses to the questions; there is no reason to believe the response came from someone other than Dr. Parrillo. Dr. Parrillo wrote that she found positive trigger points on examination in the cervical and lumbar spine and another illegible location. The response to medication had been minimal. R. 718. Dr. Parrillo responded the medications Flexeril, Lyrica and Hydrocodone could interfere with Wiley's focus, concentration and/or cause cognitive defects. R. 719. Finally, examination findings showed that Wiley had 4/5 strength in her upper and lower extremities. *Id.* Dr. Parrillo did not know if Wiley performed home exercise or was in physical therapy. *Id.*

## ANALYSIS.

Wiley raises only two assignments of error. First, she contends that the ALJ did not apply the correct legal standard to the opinions of Dr. Parrillo, a treating physician. Second, she submits that the ALJ also did not apply the correct legal standard to the opinion of Dr. Perdomo, an examining physician. I will address these assignments of error in turn.

*Opinions of Dr. Parrillo.*

Wiley contends that the ALJ erred by giving no significant weight to the functional capacity opinion of Dr. Parrillo. Dr. Parrillo was one of Wiley's treating physicians.

The opinion of a treating physician "'must be given substantial or considerable weight unless 'good cause' is shown to the contrary.'" *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004)(quoting *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)). Good cause exists when (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's medical records. *Id.* at 1240-41. The ALJ must articulate the reasons for giving less weight to the opinion of a treating physician. *Lewis*, 125 F.3d at 1440.

The ALJ found that Dr. Parrillo's functional capacity assessment was inconsistent with his treatment notes and objective medical findings. The ALJ also found that Dr. Parrillo made inconsistent findings about Wiley's strength in her extremities. Additionally, the ALJ noted that Wiley was not always complaint with treatment. R. 19.

The ALJ's reasons for not giving significant weight to Dr. Parrillo's functional capacity assessment are support by substantial evidence in the record. *See Siverio v. Comm'r of Soc. Sec.*, 461 F. App'x 869, 872 (11th Cir. 2012)(finding ALJ's conclusion that a physician's opinion was "not consistent with other evidence of record as discussed in the body of the decision" to be

supported by substantial evidence).[5]  On two occasions, Dr. Parrillo declined to provide a functional capacity assessment to Wiley's disability insurer and student loan provider, stating in one instance that such an evaluation was outside his training.[6]  Moreover, Dr. Parrillo's functional capacity assessment form contains no reference to underlying findings on testing or examination supporting his opinions.  Dr. Parrillo's treatment notes also do not contain findings made on examination of Wiley regarding muscle and grip strength, limitation on range of motion or other objective findings. Finally, there is one treatment note reflecting that Wiley was not compliant because she did not take an increased dosage of medication as prescribed.[7]  R. 19.

Because the ALJ articulated specific and adequate reasons for giving no significant weight to Dr. Parrillo's opinions, I recommend that the Court find the first assignment of error to be unavailing.

*Dr. Perdomo.*

Wiley also asserts that the ALJ erred by giving only partial weight to Dr. Perdomo's functional capacity assessment following his examination of Wiley.  The ALJ found that Dr. Perdomo appeared to have considered Wiley's subjective allegations more than objective medical findings.  Specifically, the ALJ found that limitations with sitting, standing, and walking a

---

[5] Unpublished decisions of the Eleventh Circuit are cited as persuasive authority.

[6] Counsel for Wiley argues that the notation N/A in the Functional Capabilities section of the Attending Physician's Statement of Continued Disability meant that Wiley could not perform any of the listed activities.  Doc. No. 16, at 22.  The Commissioner correctly argues that N/A is generally used to mean "not applicable" rather than unable to perform.  *Id.* at 29.

[7] The ALJ also found that Wiley was not compliant because she had not lost substantial weight after gastric by-pass surgery.  R. 19.  The records reflect that Wiley weighed 222 pounds in November 2010, before the gastric by-pass surgery.  R. 587.  She dropped to a low of 187 pounds, a 35-pound loss, as of July 25, 2011.  R. 706.  However, by January 17, 2012, she weighed 196 pounds, only a 26-pound loss from her weight before gastric by-pass surgery.  R. 700.  I recommend that the Court find that the dispute about whether this amount of weight loss was substantial does not otherwise undermine the significant evidence supporting the ALJ's decision to give no significant weight to Dr. Parrillo's functional capacity assessment.

combined total of three to four out of eight-hours were not consistent with the radiology studies showing only mild impairments, failure to identify trigger points consistent with fibromyalgia, only mildly limited range of motion in Wiley's spine, and the opinion of Dr. Harris, a reviewing physician.   R. 19.

Dr. Perdomo's report reflects that Wiley told him that she could not stand, walk or sit for more than twenty to thirty minutes at a time.   R. 611.   After examining Wiley, Dr. Perdomo opined that Wiley could stand, walk and sit for a combined total of only three to four hours in an eight-hour workday.   He stated in support of this opinion Wiley's "chronic back pain, diffuse joint pain, and the musculoskeletal functional limitations found on physical examination of her hips, lumbosacral spine, and shoulders . . . ."   R. 613.

Unlike Dr. Parrillo, Dr. Perdomo cited findings on examination to support his opinion. Importantly, Dr. Perdomo is board certified in family medicine. Certification Matters, *Is My Doctor Board Certified?*, at https://www.certificationmatters.org (last visited July 13, 2015).    As such, his opinion as both an examining physician and a specialist is entitled to greater weight than the opinion of the reviewing physician.   *See Kemp v. Astrue*, 308 F. App'x 423, 427 (11th Cir. 2009)("The opinion of a non-examining physician is entitled to little weight when it contradicts the opinion of an examining physician."); 20 C.F.R. §§ 404.1527(c)(5) (stating that more weight is given to the opinion of a specialist about a medical issue related to his area of specialty).

It is also significant, in my view, that the ALJ adopted Dr. Perdomo's opinion except the restrictions on sitting.   Dr. Perdomo's restrictions on the amount of time Wiley could sit, if adopted, would have resulted in Wiley being able to perform less than the full range of sedentary activity resulting in a very limited availability of jobs she could perform.

Considering the record as a whole, I recommend that the Court find that the ALJ's

decision to not accept one portion of Dr. Perdomo's functional capacity assessment is not supported by substantial evidence in the record. If this recommendation is accepted, then I further recommend that the case be remanded for further proceedings. It would be advisable, on remand, for the Commissioner to require the ALJ to develop the record through step five of the sequential analysis even if the ALJ again concludes that Wiley could return to her past relevant work.

### RECOMMENDATION.

For the reasons stated above, I **RESPECTFULLY RECOMMEND** that the final decision of the Commissioner be **REVERSED** pursuant to sentence four of § 405(g) and that the case be **REMANDED** for further proceedings. I further **RECOMMEND** that the Court direct the Clerk of Court to issue a judgment consistent with its decision on this Report and Recommendation and, thereafter, to close the file.

**Failure to file written objections to the proposed findings and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its filing shall bar an aggrieved party from challenging on appeal the district court's order based on unobjected-to factual and legal conclusions.**

Respectfully recommended this 13th day of July 2015.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Presiding District Judge
Courtroom Deputy Clerk
Counsel of Record